USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/25/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                        :
                                        :
                                        :          07 Civ. 9841
                                        :
IN RE CITIGROUP INC. SHAREHOLDER        :          OPINION & ORDER
DERIVATIVE LITIGATION                   :
                                        :
                                        :
                                        :
---------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

        This is a consolidated shareholder derivative action brought by shareholders of

Citigroup, Inc., a Delaware corporation, against a number of Citigroup's current and

former officers and directors.  Plaintiffs brought this action without first making a

demand on Citigroup's board to bring suit as required by Delaware law.

        Defendants have moved to dismiss the consolidated complaint pursuant to Federal

Rules of Civil Procedure 12(b)(6) and 23.1.  Defendants contend that (1) the complaint

does not adequately allege that plaintiffs are excused from the pre-suit demand

requirement and (2) the complaint fails to state a claim upon which relief may be granted.

        Because the complaint fails to allege with specificity facts showing that plaintiffs

are excused from the pre-suit demand requirement, defendants' motion to dismiss is

granted.

## I.      BACKGROUND

        Unless otherwise noted, the following facts are drawn from the complaint and are,

at this stage of the proceedings, presumed to be true.

1

## A.     The Parties

Plaintiffs are shareholders of Citigroup, Inc., a global financial services company incorporated in Delaware and headquartered in New York. (Compl. ¶¶ 8-10.) After five shareholder derivative actions were filed on behalf of Citigroup in this Court, the actions were consolidated, and lead plaintiffs, lead counsel, and liaison counsel were appointed. (Order, Aug. 22, 2008.) A consolidated complaint was filed on November 10, 2008.[1]

Defendants are current and former officers and directors of Citigroup, including Charles O. Prince, Citigroup's former CEO and Board Chairman (Compl. ¶ 12); current and former members of Citigroup's board of directors (*id.* ¶¶ 13-26); and current and former officers of Citigroup and Citigroup subsidiaries (*id.* ¶¶ 27-35).

## B.     Citigroup's Losses from Mortgage-Related Holdings

The impetus of this action is the billions of dollars that Citigroup has lost from its investments in mortgages and mortgage-related securities. Plaintiffs allege that, in the mid-2000s, Citigroup invested heavily in assets tied to real estate mortgages, especially so-called "subprime" mortgages that carried a greater risk of default. (*Id.* ¶¶ 44-47.) When the housing market collapsed in 2006 and 2007, plaintiffs allege that Citigroup was forced to take billion-dollar write-downs on its mortgage-related holdings, and as a result, Citigroup's stock price precipitously declined. (*Id.* ¶¶ 82-83.)

## C.     This Action

Plaintiffs bring this action on behalf of Citigroup alleging five types of wrongdoing in connection with Citigroup's mortgage-related losses. First, plaintiffs allege that defendants breached their fiduciary duties of care and loyalty by allowing

---

[1] Unless otherwise noted, all references to the "complaint" in this Opinion are references to the "Verified Consolidated Derivative Action Complaint" dated November 10, 2008.

Citigroup to make risky mortgage-related investments when defendants knew, or should have known, that the investments could lead to significant losses. (*See id.* ¶¶ 53-66.) Plaintiffs claim that defendants ignored "red flags" that should have alerted them to the impending downturn in the housing market and, therefore, to Citigroup's potential losses. (*Id.* ¶¶ 49-52.)

Second, plaintiffs allege that defendants breached their fiduciary duty of disclosure by failing to inform shareholders of Citigroup's "subprime exposure." (*Id.* ¶¶ 67-83.) According to plaintiffs, various statements made by Citigroup and individual defendants were misleading because the statements never "discussed or disclosed" the "extent of Citi's massive subprime risk and impending collapse." (*Id.* ¶ 68.)

Third, plaintiffs allege that defendants breached their fiduciary duties of care and loyalty and wasted corporate assets by causing Citigroup to repurchase a substantial amount of its own stock in 2007. (*Id.* ¶¶ 96-99.) Defendants knew or should have known, plaintiffs claim, that the price at which Citigroup repurchased its shares was "artificially inflated." (*Id.* ¶ 96.)

Fourth, plaintiffs allege that defendants committed securities fraud. Although plaintiffs' claim is far from precise, plaintiffs appear to assert that defendants committed securities fraud by making or authorizing misleading statements that omitted the extent of Citigroup's investment in subprime mortgages. (*Id.* ¶¶ 123-38.) Plaintiffs bring that claim on behalf of Citigroup, and not on behalf of themselves or other investors, on the ground that Citigroup suffered losses from the alleged fraud when defendants caused Citigroup to repurchase its own stock in 2007. (*Id.*)

Fifth, plaintiffs claim that some defendants committed insider trading by selling Citigroup stock while in the possession of material, non-public information. (*Id.* ¶¶ 84-87.)[2]

### D.   The Delaware Action

On November 9, 2007, three days after this action was filed, a group of shareholders brought a derivative action on behalf of Citigroup in the Delaware Court of Chancery asserting claims similar to those alleged here. *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 114-15 (Del. Ch. 2009) (Chandler, C.).[3] Like the complaint in this action, the complaint in the *Delaware Citigroup* action alleged that current and former officers and directors of Citigroup breached their fiduciary duties by "(1) failing to adequately oversee and manage Citigroup's exposure to the problems in the subprime mortgage market, even in the face of alleged 'red flags' and (2) failing to ensure that the Company's financial reporting and other disclosures were thorough and accurate." *Id.* at 114. The *Delaware Citigroup* complaint also alleged, similar to the complaint here, that the directors and officers wasted corporate assets by "authorizing and not suspending the Company's share repurchase program in the first quarter of 2007, which allegedly resulted in the Company buying its own shares at 'artificially inflated prices.'" *Id.* at 115.

---

[2] The complaint asserts those claims by means of six counts. Count I alleges violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. (*Id.* ¶¶ 129-38.) Count II alleges a breach of the fiduciary duties of care and loyalty. (*Id.* ¶¶ 139-44.) Count III alleges a breach of fiduciary duty for insider trading. (*Id.* ¶¶ 145-49.) Count IV alleges a breach of the fiduciary duty of disclosure. (*Id.* ¶¶ 150-54.) Count V alleges waste of corporate assets. (*Id.* ¶¶ 155-57.) Count VI alleges unjust enrichment. (*Id.* ¶¶ 158-60.)

[3] That action will be referred to as the "*Delaware Citigroup*" action.

The *Delaware Citigroup* complaint was not, however, identical to the complaint in this action. The *Delaware Citigroup* complaint asserted three additional claims of waste that are not asserted here, including a claim that the board wasted corporate assets by "approving a multi-million dollar payment and benefit package for defendant Prince upon his retirement as Citigroup's CEO in November 2007." *Id.* Furthermore, the *Delaware Citigroup* complaint did not allege securities fraud, though securities fraud is alleged here.

On February 24, 2009, Chancellor Chandler dismissed each of the claims in the *Delaware Citigroup* complaint except the claim of waste involving Prince's retirement package. *Id.* at 139-140. Chancellor Chandler found that dismissal was warranted because the complaint had inadequately alleged that plaintiffs were excused from the pre-suit demand requirement. *Id.* With respect to the claim of waste for Prince's retirement package, Chancellor Chandler explained that he had too little information regarding the circumstances of the deal to find that demand was not excused. *Id.* at 138.

Although defendants have not asserted claim or issue preclusion in connection with the *Delaware Citigroup* action, Chancellor Chandler's opinion nevertheless provides particularly instructive guidance. To the extent that Delaware law controls in this action, Chancellor Chandler's opinion presents a Delaware court's application of Delaware law to claims and defenses substantially similar to those raised here. It is "well-established" that "the controlling interpretation of state laws should normally be given by state rather than federal courts." *Yoon v. Fordham Univ. Faculty & Admin. Ret. Plan*, 263 F.3d 196, 203 (2d Cir. 2001) (collecting cases).

## II.   DISCUSSION

A complaint asserting a derivative action on behalf of a Delaware corporation must allege with particularity either (1) that the plaintiff has demanded that the board bring suit and the board has wrongfully refused or (2) that the plaintiff is excused from making a pre-suit demand because "the directors are incapable of making an impartial decision regarding whether to institute such litigation." *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006).[4]   Here, plaintiffs have alleged that demand is excused.  (Compl. ¶ 103.)

A complaint must allege that demand is excused by means of "particularized factual statements." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000); *see also* Fed. R. Civ. P. 23.1.[5]   Thus, the complaint "must comply with stringent requirements of factual particularity" that "differ substantially" from the requirements of notice pleading. *Brehm*, 746 A.2d at 254.  "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *Id.* at 255.

Delaware courts have established two tests for deciding whether demand is excused.  Where the complaint either "does not address an action taken by the board" or "alleges that the board failed to act," *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963,

---

[4] Issues involving pre-suit demand are analyzed under the law of the state of incorporation—here, Delaware. *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (citing *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 108-09 (1991)).

[5] "[W]hen one or more shareholders or members of a corporation . . . bring a derivative action to enforce a right that the corporation . . . may properly assert but has failed to enforce[,] . . . [t]he complaint must be verified and must . . . state *with particularity* . . . (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1 (emphasis added).

986 (Del. Ch. 2007), the complaint must set forth particularized allegations creating a reasonable doubt that, "as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand," *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). Where the complaint challenges a specific transaction approved by the board, a complaint can show that demand is excused by creating a reasonable doubt that either (1) "the directors are disinterested and independent" or (2) "the challenged transaction was . . . the product of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984); *see also Brehm*, 746 A.2d at 253.

The complaint here focuses almost entirely on creating a reasonable doubt that the directors were "disinterested and independent" (*see* Compl. ¶¶ 103-28), which is the only way to show that demand is excused under *Rales*, 634 A.2d at 934, and one of two ways to do so under *Aronson*, 473 A.2d at 814. The complaint makes only one attempt to show that demand is excused under the second prong of *Aronson*, as the only specific, board-approved transaction the complaint challenges is the directors' authorization of a stock repurchase program.[6] (Compl. ¶¶ 123-28.)

In assessing whether the complaint shows that the directors are disinterested and independent, the inquiry focuses on "the circumstances existing at the commencement of [the] suit." *Aronson*, 473 A.2d at 810; *see also In re infoUSA*, 953 A.2d at 985 ("[D]emand is made against the board of directors at the time of filing of the complaint."). Here, therefore, the question is whether the Citigroup board as it existed in

---

[6] Plaintiffs argue that "all counts" of the complaint should be analyzed under *Aronson* (Pls.' Mem. in Opp. 12), but they do not identify any board-approved transactions—other than the stock repurchase program—that they challenge under *Aronson*'s second prong.

November 2007[7] was "incapable . . . of objectively evaluating a demand."[8] *Brehm*, 746 A.3d at 257.

"There are two ways that a plaintiff can show that a director is unable to act objectively with respect to a pre-suit demand." *In re infoUSA*, 953 A.2d at 985. First, a plaintiff can show that a director is "personally interested in the outcome of the litigation, in that the director will personally benefit or suffer as a result of the lawsuit." *Id.* (citing *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004)). Here, plaintiffs allege that the directors on the November 2007 board are "personally interested in the outcome of the litigation" because the directors will themselves face liability if this action goes forward. (Compl. ¶¶ 106-28.)

Second, a plaintiff can show that a director is "unable to act objectively with respect to a pre-suit demand" by showing that the director is "dominated through a close personal or familial relationship or through force of will, or is so beholden to an interested director that his or her discretion would be sterilized." *In re infoUSA*, 953 A.2d at 985 (quotations omitted). Here, the complaint alleges that the directors are unable to act independently because the directors' "personal and business relationships are rife with conflicts." (Compl. ¶¶ 104-05.)

---

[7] The "commencement" of this action, *see Aronson*, 473 A.2d at 810, took place on November 6, 2007, when the initial complaint was filed in the first of the now-consolidated derivative actions (Docket, 07 Civ. 9841), *see Delaware Citigroup*, 964 A.2d at 112 (determining whether demand was excused on the date "when the first of plaintiffs' now-consolidated derivative actions was filed").

[8] The complaint alleges that Win Bischoff should be considered a member of Citigroup's board for purposes of evaluating whether demand is excused. (*See* Compl. ¶¶ 26, 103.) But Defendants assert in their moving papers that Bischoff did not join Citigroup's board until December 2007, one month after the relevant period. (Defs.' Mem. in Supp. 3 (citing Notice of Annual Meeting of Stockholders 50 n.4, Ex. 1 to Rosen Decl., Dec. 22, 2008).) Plaintiffs do not appear to dispute defendants' claim, and thus this Court will take judicial notice of the fact that Bischoff was not part of the November 2007 board. *Cf. Delaware Citigroup*, 964 A.2d at 112 n.1 (listing Bischoff as a Citigroup officer but not a Citigroup director for a complaint filed in November 2007).

### A.     The Complaint Does Not Show a Substantial Likelihood of Director Liability

The complaint alleges that the directors are personally interested in this action—and thus cannot act objectively in considering a pre-suit demand—because the directors will face a substantial likelihood of personal liability if this action goes forward.  It is well-settled that the "mere threat of personal liability . . . , standing alone, is insufficient to challenge either the independence or the disinterestedness of directors." *Aronson*, 473 A.2d at 815; *see also Brehm*, 746 A.2d at 257 n.34; *Delaware Citigroup*, 964 A.2d at 121.  Rather, demand is excused only in "rare cases" where there is a "substantial likelihood of director liability." *Aronson*, 473 A.2d at 815; *Delaware Citigroup*, 964 A.2d at 121.

Among the complaint's many claims, there are effectively five ways that the complaint attempts to show that the November 2007 directors face a substantial likelihood of liability if this action goes forward.  The complaint claims that the directors face liability for (1) "allowing" Citigroup to invest in subprime mortgages, (2) failing to disclose the extent of Citigroup's investment in subprime mortgages, (3) approving a stock repurchase plan, (4) committing securities fraud, and (5) engaging in insider trading or allowing others to engage in insider trading.  None of those claims succeeds.

### 1.     Director Liability for "Allowing" Citigroup to Invest in Subprime Mortgages

Plaintiffs allege that the directors face a substantial likelihood of liability for "allowing" Citigroup to pursue "risky financial investment in subprime mortgages" despite numerous "red flags" that should have alerted the directors to an impending collapse in the mortgage market.  (Compl. ¶¶ 49, 66; *see also* Pls.' Mem. in Opp. 23.)

The theory of relief on which that claim rests is not immediately apparent. Plaintiffs do not challenge any particular board action. Instead, plaintiffs claim that the directors breached their fiduciary duties by "allowing" Citigroup to invest in subprime mortgages despite "red flags." (Compl. ¶ 66.)[9] Accordingly, plaintiffs' claim is akin to a failure-of-oversight claim pursuant to *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).[10] Yet as Chancellor Chandler recently explained in addressing similar allegations in the *Delaware Citigroup* action, plaintiffs' "theory of how the director defendants will face personal liability is a bit of a twist on the traditional *Caremark* claim." 964 A.2d at 123.

A *Caremark* claim typically involves allegations that directors failed to detect "employee misconduct or violations of law." *Id.* Here, however, plaintiffs allege that the directors failed "to properly monitor Citigroup's *business risk*, specifically its exposure to the subprime mortgage market." *Id.* (emphasis in original). As Chancellor Chandler recognized, that claim is really an attempt "to hold the director defendants personally liable for making (or allowing to be made) business decisions that, in hindsight, turned out poorly for the Company." *Id.* at 124. As a result, plaintiffs' claim implicates the

---

[9] *See also, e.g.*, Pls.' Mem. in Opp. 23 ("Defendants' actions sufficiently show a breach of fiduciary duty where Defendants . . . *allowed* Citi to venture into risky assets despite red flags that the assets were toxic . . . ." (emphasis added)); Compl. ¶ 121 ("[T]he Audit Committee (and Board) failed to *ensure* that the Company implemented requisite *internal controls* over its lending practices to prevent the Company from making loans to unqualified persons." (emphasis added)).

[10] The Delaware Supreme Court has held that

> *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.

*Stone*, 911 A.2d at 370. "In either case," the Court explained, "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." *Id.*

business judgment rule[11] as well as a provision in Citigroup's certificate of incorporation that exculpates directors from violations of the duty of care.[12]  *Id.* at 124-125.

Therefore, to show director liability for "allowing" Citigroup to take business risks despite "red flags," plaintiffs face a substantial pleading burden:

> The Delaware Supreme Court made clear in *Stone* that directors of Delaware corporations have certain responsibilities to implement and monitor a system of oversight; however, this obligation does not eviscerate the core protections of the business judgment rule—protections designed to allow corporate managers and directors to pursue risky transactions without the specter of being held personally liable if those decisions turn out poorly.  Accordingly, the burden required for a plaintiff to rebut the presumption of the business judgment rule by showing gross negligence is a difficult one, and the burden to show bad faith is even higher.  Additionally, as former-Chancellor Allen noted in *Caremark*, director liability based on the duty of oversight is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.  The presumption of the business judgment rule, the protection of an exculpatory [8 Del. Code] § 102(b)(7) provision, and the difficulty of proving a Caremark claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure to see the extent of a company's business risk.

*Id.* at 125 (quotations and citations omitted).  In sum, to show that the directors face a substantial likelihood of liability for "allowing" Citigroup to invest in subprime mortgages, the complaint must contain "particularized factual allegations demonstrating bad faith by the director defendants."  *Id.* at 127.[13]

---

[11] "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *Delaware Citigroup*, 964 A.2d at 124 (Del. Ch. 2009) (quoting *Aronson*, 473 A.2d at 812).

[12] "Citigroup has adopted a provision in its certificate of incorporation pursuant to 8 Del. C. § 102(b)(7) that exculpates directors from personal liability for violations of fiduciary duty, except for, among other things, breaches of the duty of loyalty or actions or omissions not in good faith or that involve intentional misconduct or a knowing violation of law."  *Delaware Citigroup*, 964 A.2d at 124.

[13] Plaintiffs do not allege that the directors were personally interested in the transactions at issue.

Even if a plaintiff could, theoretically, establish that the directors acted in bad faith by showing that "the directors utterly failed to implement any reporting or information system" for monitoring business risk, *see Stone*, 911 A.2d at 370, plaintiffs here acknowledge (Compl. ¶ 120) that the board had such a system in place in its "Audit and Risk Management Committee," *accord Delaware Citigroup*, 964 A.2d at 127.

Instead, plaintiffs allege that the board acted in bad faith because, though the board had a system for monitoring business risk, the board failed to act on evidence of approaching catastrophe. In particular, plaintiffs cite newspaper articles chronicling the collapse of the subprime mortgage market (Compl. ¶¶ 49-65) and claim that the "articles show that Citi's Board acted in bad faith" by "ignor[ing] red flags that eventually caused tremendous damage to Citi" (*id.* ¶ 66).

Those allegations, however, do not show a substantial likelihood of director liability. The newspaper articles cited in the complaint are simply "not evidence that the directors consciously disregarded their duties or otherwise acted in bad faith; at most they evidence that the directors made bad business decisions." *Delaware Citigroup*, 964 A.2d at 128. As Chancellor Chandler explained:

> That the director defendants knew of signs of a deterioration in the subprime mortgage market, or even signs suggesting that conditions could decline further, is not sufficient to show that the directors were or should have been aware of any wrongdoing at the Company or were consciously disregarding a duty somehow to prevent Citigroup from suffering losses.

*Id.* Indeed, neither the articles nor any other part of the complaint specifies "how the board's oversight mechanisms were inadequate or how the director defendants knew of these inadequacies and consciously ignored them." *Id.* "Rather, plaintiffs seem to hope the Court will accept the conclusion that since the Company suffered large losses, and since a properly functioning risk management system would have avoided such losses,

12

the directors must have breached their fiduciary duties in allowing such losses." *Id.* This Court, like the Delaware Court of Chancery, *see id.*, does not find that inference "reasonable," *see Brehm*, 746 A.2d at 255.

Plaintiffs have failed, therefore, to set forth particularized allegations creating a reasonable doubt that the directors acted in bad faith. As a result, plaintiffs have not shown that demand is excused on the ground that the directors face a substantial likelihood of liability for "allowing" Citigroup to invest in subprime mortgages.

### 2.    Director Liability for Failing to Disclose the Extent of Citigroup's Investment in Subprime Mortgages

Plaintiffs allege that the directors face a substantial likelihood of liability for breaching their fiduciary duties by failing to disclose to shareholders the extent of Citigroup's investment in subprime mortgages. (Compl. ¶ 95.)[14] Chancellor Chandler described the standards that apply to such a claim:

> Even in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith. When there is no request for shareholder action, a shareholder plaintiff can demonstrate a breach of fiduciary duty by showing that the directors deliberately misinformed shareholders about the business of the corporation, either directly or by a public statement. Citigroup's certificate of incorporation exculpates the director defendants from personal liability for violations of fiduciary duty except for, among other things, breaches of the duty of loyalty and acts or omissions not in good faith or that involve intentional misconduct or knowing violation of law. Thus, to show a substantial likelihood of liability that would excuse demand, plaintiffs must plead particularized factual allegations that support the inference that the disclosure violation was made in bad faith, knowingly or intentionally.

---

[14] *See also* Pls.' Mem. in Opp. 23 ("Defendants' actions sufficiently show a breach of fiduciary duty where Defendants . . . allowed Citi to venture into risky assets . . . [and] failed to disclose the mere existence of those assets . . . .").

*Delaware Citigroup*, 964 A.2d at 132 (quotations, citations, and alterations omitted).

Chancellor Chandler cited three grounds on which the failure-to-disclose allegations in

the *Delaware Citigroup* action did not show a substantial likelihood of liability. *Id.* at

132-35.  The allegations here are insufficient on the same three grounds.

First, the complaint fails to "allege with particularity which disclosures were

misleading." *Id.* at 133.  Some of plaintiffs' allegations about Citigroup's disclosures

(*see* Compl. ¶¶ 73, 76, 93) must be rejected as conclusory because they fail to "identify

any actual disclosure that was misleading or any statement that was made misleading as a

result of an omission of a material fact." *Delaware Citigroup*, 964 A.2d at 133.  Other

allegations contain multi-page quotations but fail to specify which statements were

misleading and why those statements were misleading.  (*See* Compl. ¶¶ 70, 75, 77.)

Plaintiffs do allege, vaguely, that all the statements were misleading because they were

"positive" and "the extent of Citi's massive subprime risk and impending collapse was

never discussed or disclosed." (*Id.* ¶¶ 68, 74, 77.)  But plaintiffs do not "allege with

specificity . . . when the Company was obligated to make disclosures, what specifically

the Company was obliged to disclose, and how the Company failed to do so." *Delaware

Citigroup*, 964 A.2d at 133.[15]  Accordingly, the complaint does not contain key facts

necessary "to determine whether the directors made the [alleged] misstatements or

omissions knowingly or in bad faith." *Id.* at 134.

---

[15] In addition, plaintiffs allege that Citigroup's SEC filings were misleading because they failed to abide by recognized accounting standards.  The complaint, however, simply lists accounting principles and alleges baldly that Citigroup's filings violated those principles. (*See* Compl. ¶¶ 88-95.)  Those allegations do not contain any particularized facts sufficient to permit an inference that the directors made any misstatements or omissions in bad faith.

Second, the complaint "does not contain specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures." *Id.* The complaint alleges only that the directors "participated in the preparation of improper financial statements" or "authorized" or "permitted the false statements." (Compl. ¶¶ 121, 122(d).) Those allegations are unsupported conclusions, not particularized facts, and thus plaintiffs fail to meet the "stringent requirements of factual particularity," *Brehm*, 746 A.2d at 254, necessary to allege "board involvement in the preparation of the disclosures," *Delaware Citigroup*, 964 A.2d at 134.

Third, the complaint "does not sufficiently allege that the director defendants had knowledge that any disclosures or omissions were false or misleading or that the director defendants acted in bad faith in not adequately informing themselves." *Id.* at 134. The "red flags" cited in the complaint are no more than newspaper reports of an impending crisis in the subprime mortgage market. (*See* Compl. ¶¶ 49-50.) As Chancellor Chandler explained, "[m]erely alleging that there were signs of problems in the subprime mortgage market is not sufficient to show that the director defendants knew that Citigroup's disclosures were false or misleading." *Delaware Citigroup*, 964 A.2d at 135. Nor can plaintiffs show that the directors knew Citigroup's disclosures were misleading by citing newspaper articles claiming that the directors "saw the writing on the wall." (Compl. ¶ 60; *see also id.* ¶ 63.) Those claims are themselves unsupported and conclusory. *Cf. Brehm*, 746 A.2d at 249 (finding that a "pleader may rely on factual statements in the media" but not when "the quotations from the media . . . simply echo plaintiffs' conclusory allegations").

Thus, plaintiffs have not shown that demand is excused on the ground that the directors face a substantial likelihood of liability for failing to disclose to shareholders the extent of Citigroup's investment in subprime mortgages.

### 3. Director Liability for Approving a Stock Repurchase Program

Plaintiffs allege that the directors face a substantial likelihood of liability for authorizing a stock repurchase program. Plaintiffs claim that, by approving a program in which Citigroup purchased hundreds of millions of dollars of its own stock at an allegedly "artificially inflated" market price, the directors wasted corporate assets and breached their fiduciary duties. (Compl. ¶¶ 123-26, 156; *see also* Pls.' Mem. in Opp. 23, 28.)

To the extent that plaintiffs assert a claim of waste, the complaint "must allege particularized facts that lead to a reasonable inference that the director defendants authorized 'an exchange so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" *Delaware Citigroup*, 964 A.2d at 136 (quoting *Brehm*, 746 A.2d at 263).

Plaintiffs' claim does not meet that standard. As Chancellor Chandler recognized in addressing a similar claim, "plaintiffs have alleged nothing that would explain how buying stock at the market price—the price at which ordinary and rational businesspeople were trading the stock—could possibly be so one sided that no reasonable and ordinary business person would consider it adequate consideration." *Id.* at 137. Thus, plaintiffs have failed to show that demand is excused because the directors face a substantial likelihood of liability for corporate waste for authorizing Citigroup to repurchase its own stock on the open market.

To the extent that plaintiffs assert a claim of breach of fiduciary duty based on the stock repurchases, plaintiffs' claim is subject to the provision in Citigroup's certificate of incorporation that exculpates directors from violations of the duty of care.[16] To prevail, therefore, plaintiffs must show that the directors acted in bad faith[17] when they approved the stock repurchases. *Cf. id.* at 125-27.

Plaintiffs have not made that showing. As discussed above, plaintiffs' allegations show at most that the stock repurchases were bad business decisions in light of the subsequent decline in the price of Citigroup stock. *Cf. id.* at 128. The complaint sets forth no "'particularized facts that demonstrate that the directors . . . had actual or constructive knowledge that their conduct'" in authorizing the repurchases "'was legally improper.'" *Id.* at 125 (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)). Thus, plaintiffs have not succeeded in pleading that demand is excused on the ground that the directors face a substantial likelihood of personal liability for breach of fiduciary duty in connection with the stock repurchase program.

### 4.    Director Liability for Securities Fraud[18]

Plaintiffs allege that the directors face a substantial likelihood of personal liability for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs claim that "the Board knowingly caused Citi to repurchase its own shares at an artificially inflated price, when Defendants knew or were

---

[16] *See supra* note 12.

[17] Plaintiffs do not allege that the directors were interested in the transaction at issue.

[18] The following analysis addresses only the securities fraud allegations in this action.  The securities fraud allegations in the related actions *In re Citigroup Inc. Securities Litigation*, 07 Civ. 9901, and *In re Citigroup Inc. Bond Litigation*, 08 Civ. 9522, will be analyzed in connection with the pending motions in those actions.

already on notice that Citi's adverse financial exposure to its subprime assets was a material undisclosed fact that needed to be disclosed." (Pls.' Surreply 3, *see also* Compl. ¶¶ 123-38.)

In addition to the "stringent requirements of factual particularity" required to show that demand is excused, *Brehm*, 746 A.2d at 254; Fed R. Civ. P. 23.1, plaintiffs' securities fraud allegations are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)); *see also* 15 U.S.C. § 78u-4(b)(1).  The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2). Considered "in its entirety," the complaint creates a "strong inference" of scienter only if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 324 (2007).

The complaint here fails to meet many of the applicable requirements.  First, the complaint fails to allege with specificity which statements plaintiffs contend are fraudulent. As set forth above, some of the complaint's allegations do not even identify specific statements (*see* Compl. ¶¶ 73, 76, 93; *see also id.* ¶ 72), and other allegations set

18

out lengthy quotations without specifying which of the scores of statements contained in the quotations plaintiffs allege to be fraudulent (*see id.* ¶¶ 70, 75, 77).[19]

Second, the complaint does not allege with specificity *why* any alleged misstatement is fraudulent. In general terms, plaintiffs' claim is that the statements cited in the complaint were misleading because the statements never "discussed or disclosed" the "extent of Citi's massive subprime risk and impending collapse." (*Id.* ¶ 68.) But the complaint makes almost no attempt to identify individual statements and specify why information about "Citi's massive subprime risk" (*id.*) was "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. The complaint's only bow in the direction of specificity is a claim that the statements were misleading because they were "positive" or "championed Citi's financial health." (Compl. ¶¶ 74, 76-77.) But bare contentions such as those do not, without more, meet the specificity requirements of Rule 9(b), Rule 32.1, and the PSLRA, 15 U.S.C. § 78u-4(b)(1). *See ATSI Commc'ns*, 493 F.3d at 99 ("A securities fraud complaint based on misstatements must . . . explain why the statements were fraudulent. Allegations that are conclusory . . . are insufficient." (citations omitted)).

Third, the complaint does not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). As noted above, media reports about a downturn in the subprime mortgage industry do not, by themselves, permit the inference that the directors knew or should have known that any of the statements cited in the complaint were misleading.

---

[19] If plaintiffs allege that each and every statement in the quotations is fraudulent, plaintiffs have utterly failed to explain why those statements are fraudulent.

And a claim in a newspaper article that the directors "saw the writing on the wall" is not a sufficiently particular allegation where the claim is itself conclusory and unsupported. (Compl. ¶ 60; *see also id.* ¶ 63.) Thus, plaintiffs have not alleged facts that would make "the inference of scienter cogent." *Tellabs*, 551 U.S. at 324.

Finally, plaintiffs have failed to allege that Citigroup was deceived as a result of any alleged fraud. Though plaintiffs' allegations of scienter are insufficient, the thrust of plaintiffs' claim is that the directors approved the stock repurchases while *knowing* about the alleged misstatements. (*See, e.g.*, Compl. ¶ 123). The Second Circuit has held that where, as here, there are no allegations that the directors were personally interested in the transaction or were dominated by individuals interested in the transaction, "approval of the transaction by a disinterested majority of the board possessing authority to act and *fully informed of all relevant facts* will suffice to bar a Rule 10b-5 claim that the corporation or its stockholders were deceived." *Maldonado v. Flynn*, 597 F.2d 789, 793 (2d Cir. 1979) (emphasis added). Therefore, because the stock repurchases here were approved by a majority of disinterested directors—and because those directors were, according to plaintiffs, fully informed of the facts underlying the alleged fraudulent statements—plaintiffs cannot show that the directors "engaged in some form of deception" in connection with the stock repurchases. *Id.* (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977)).

Accordingly, plaintiffs have failed to set forth particularized allegations of securities fraud against the directors, and thus plaintiffs cannot show that demand is excused on the ground that the directors face a substantial likelihood of liability for securities fraud.

### 5.    Director Liability for Insider Trading

Finally, plaintiffs intimate that the directors face a substantial likelihood of

personal liability for insider trading. (*See* Pls.' Mem. in Opp. 23 ("[T]he Defendants'

actions sufficiently show a breach of fiduciary duty where Defendants: . . . (4) selling

[sic] and allowing others to sell shares while in possession of material, non-public

information."); *see also* Compl. ¶ 113.)

The complaint alleges insider trading against only one member of the November

2007 board. (Compl. ¶ 84.) Even assuming that plaintiffs could show that a single

director faces a substantial likelihood of liability for insider trading, the complaint does

not make those allegations against a *majority* of the November 2007 board. *See Aronson*,

473 A.2d at 815 & n.8; *see also Rales*, 634 A.2d at 930, 933.

To the extent that plaintiffs claim that a majority of the November 2007 board

faces liability for "allowing others" to engage in insider trading (Pls.' Mem. in Opp. 23),

the complaint is devoid of any specific allegations in support of that claim. Accordingly,

plaintiffs have not shown that demand is excused on the ground that the directors face a

substantial likelihood of liability for insider trading.

### B.    The Complaint Does Not Show that the Directors Are Dominated by or Beholden to Individuals Interested in This Action

The complaint further alleges that the directors cannot act objectively in

considering a pre-suit demand because the directors are not independent from individuals

who are interested in this action. "In order to show lack of independence, the complaint

of a stockholder-plaintiff must create a reasonable doubt that a director is not so

'beholden' to an interested director . . . that his or her 'discretion would be sterilized.'"

*Beam*, 845 A.2d at 1050 (quoting *Rales*, 634 A.2d at 936).

Plaintiffs make a handful of allegations about the November 2007 directors in an effort to show that their "personal and business relationships are rife with conflicts." (Compl. ¶ 104.) Not one of those allegations, however, demonstrates the kind of bias necessary to create a reasonable doubt that a director is dominated by or beholden to individuals interested in this action.

First, plaintiffs allege repeatedly that the directors hold positions in other companies that do business with Citigroup. (*See, e.g.*, *id.* ("Defendant Michael C. Armstrong: is also a director of IHS Inc., which Citigroup represented in IHS's Initial Public offering in 2005.").) But plaintiffs offer no explanation of how such alleged "conflicts" would render the directors unable to evaluate a pre-suit demand objectively. Plaintiffs do not, for instance, allege facts suggesting that a director's position at another company would be in jeopardy if the director were to vote to bring this action.

Second, plaintiffs offer scattered allegations that the directors share business and personal ties. (*See id.* ¶¶ 104-05.) "Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam*, 845 A.2d at 1050. Because plaintiffs do not allege with specificity that the directors have "financial ties, familial affinity, a particularly close or intimate business or personal affinity," or anything else "in the nature of serious allegations" suggesting the directors' bias, *id.* at 1051-52, plaintiffs have failed to allege with specificity that demand is excused because the directors are dominated by or beholden to individuals interested in this action.

22

### C.     Demand Is Not Excused

Except for the claim of waste, the complaint does not challenge a specific board-approved transaction and thus can show that demand is excused only by creating a reasonable doubt that "the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934.  As set forth above, plaintiffs have failed to meet that standard: the complaint has failed to allege with specificity either that the directors face a substantial likelihood of liability or that the directors are dominated by or beholden to individuals interested in this action.  Accordingly, demand is not excused for plaintiffs' various claims of breach of fiduciary duty, securities fraud, and unjust enrichment (Counts I-IV and VI).

For the claim of waste, the complaint challenges a specific, board-approved transaction: the share repurchase program.  Therefore, in regard to that single claim, plaintiffs can show that demand is excused only if the allegations in the complaint create a reasonable doubt that either (1) "the directors are disinterested and independent" or (2) "the challenged transaction was . . . the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814.  As described above, plaintiffs have not raised a reasonable doubt that "the directors are disinterested and independent," and plaintiffs have alleged no facts "that would explain how buying stock at the market price—the price at which ordinary and rational businesspeople were trading the stock—could possibly be so one sided that no reasonable and ordinary business person would consider it adequate consideration." *Delaware Citigroup*, 964 A.2d at 137.  Accordingly, the complaint does not create a reasonable doubt that the challenged transaction was the product of business

judgment, *see id.* at 136-37, and demand is not excused for plaintiffs' claim of waste (Count V).

In sum, the complaint fails to plead that demand is excused for any of its claims, and thus the complaint must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1.

### D.     If Plaintiffs Intend to Amend the Complaint, They Must Move for Leave to Amend

In their memoranda of law in opposition to defendants' motion to dismiss, plaintiffs have requested leave to amend the complaint in the event that defendants' motion is granted. (Pls.' Mem. in Opp. 32; Pls.' Surreply 7-8.) Even in surreply, however, plaintiffs have failed to set forth any additional facts justifying amendment. If plaintiffs intend to amend the complaint, they must for leave to amend the complaint and specify in detail how additional facts would cure the defects in the existing complaint.

### III.    CONCLUSION

Because the complaint does not adequately plead that plaintiffs are excused from the pre-suit demand requirement, defendants' motion is granted and the complaint is dismissed. Any motion to amend the complaint must be made by September 14, 2009.

Dated: New York, New York
        August 25, 2009

SO ORDERED:

Sidney H. Stein, U.S.D.J.

24